lml

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

DAVID J. DICKMAN,                          )
                                           )
      **Plaintiff,**                       )
                                           )
    **vs.**                                )        **Case No. 07-2562-JAR**
                                           )
MARY E. PETERS, in her capacity            )
as Secretary of the Department             )
of Transportation,                         )
                                           )
      **Defendant.**                      )
_____    )

## MEMORANDUM AND ORDER

Plaintiff David J. Dickman brings this action against his former employer, the Secretary of the Department of Transportation, Federal Aviation Administration ("FAA"), alleging employment discrimination under the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.*  The Court previously granted defendant's Motion to Dismiss Count III of plaintiff's Complaint, which alleged that defendant failed to promulgate and implement an affirmative action program for the hiring, placement and advancement of individuals with disabilities, including disabled veterans, in violation of both 29 U.S.C. § 791 and 38 U.S.C. § 4214(c), The Vietnam Era Veterans' Readjustment Assistant Act ("VEVRA").[1]  This matter is before the Court on defendant's Motion for Summary Judgment (Doc. 38) on plaintiff's remaining claims.[2]  For the

---

[1](Doc. 37.)

[2]In response to defendant's reply brief, plaintiff filed a Motion to File Surreply Memorandum in Opposition to Defendant's Motion for Summary Judgment (Doc. 44), which defendant opposes.  Because the reply could be construed to raise new arguments, the Court grants plaintiff's motion and has considered the arguments raised in the surreply as applicable.

reasons explained in detail below, defendant's motion is granted.

## I.      Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law."[3] In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[4]  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[5]  An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[6]

The moving party initially must show the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.[7]  In attempting to meet this standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim.[8]

Once the movant has met this initial burden, the burden shifts to the nonmoving party to

---

[3]Fed. R. Civ. P. 56(c).

[4]*Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002).

[5]*Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231-32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.,* 144 F.3d 664, 670 (10th Cir. 1998)).

[6]*Adler,* 144 F.3d at 670 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

[7]*Spaulding*, 279 F.3d at 904 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

[8]*Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler,* 144 F.3d at 671).

"set forth specific facts showing that there is a genuine issue for trial."[9]  The nonmoving party

may not simply rest upon its pleadings to satisfy its burden.[10]  Rather, the nonmoving party must

"set forth specific facts that would be admissible in evidence in the event of trial from which a

rational trier of fact could find for the nonmovant."[11]  To accomplish this, the facts "must be

identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated

therein."[12]  Rule 56(e) provides that opposing affidavits must be made on personal knowledge

and shall set forth such facts as would be admissible in evidence.[13]  The non-moving party

cannot avoid summary judgment by repeating conclusory opinions, allegations unsupported by

specific facts, or speculation.[14]

Finally, summary judgment is not a "disfavored procedural shortcut"; on the contrary, it

is an important procedure "designed to secure the just, speedy and inexpensive determination of

every action."[15]  In responding to a motion for summary judgment, "a party cannot rest on

ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the

mere hope that something will turn up at trial."[16]

---

[9]*Anderson*, 477 U.S. at 256; *Celotex,* 477 U.S. at 324; *Spaulding,* 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)).

[10]*Anderson,* 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.,* 256 F.3d 1013, 1017 (10th Cir. 2001).

[11]*Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197-98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 671).

[12]*Adams*, 233 F.3d at 1246.

[13]Fed. R. Civ. P. 56(e).

[14]*Id.*; *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (citation omitted).

[15]*Celotex,* 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

[16]*Conaway v. Smith,* 853 F.2d 789, 794 (10th Cir. 1988).

3

II.      **Statement of Uncontroverted Facts**

The Department of Veterans Affairs issued a decision to grant plaintiff a 30% disability rating on January 15, 1999, based on his heart impairment, technically called paroxysmal supraventricular tachycardia.  The rating decision stated in relevant part:

> Service connection for paroxysmal supraventricular tachycardia has been established as directly related to military service. This condition is evaluated as 30 percent disabling from May 10, 1993. . . .

> Prior to January 12, 1998, the following criteria applied: **An evaluation of 30 percent is assigned for severe, frequent attacks.**

> The VA examination September 10, 1998 noted the history of episodes of rapid heart beating beginning in 1984. The presentation was said to be a fairly typical presentation for paroxysmal supraventricular tachycardia which was said to be due to bypass tracts between the atrial chambers and the ventricular chambers of the heart. . . . Mr. Dickman has been placed on various medications and under his current therapy, continues to have 10 to 12 episodes per year, the last being for less than 10 minutes.

> The reports from Dr. Althouse show that Mr. Dickman presented in June 1991 with chest pain and tachycardia, with the first documentary evidence of tachycardia being the Holter monitor January 29, 1992. He said that the condition had been present for a long time, probably since birth and that it will be manifest under periods of stress. (emphasis added)

Plaintiff testified that after his supraventricular tachycardia had been documented in January 1992, he began taking medication to help control the condition.  For approximately two years prior to then, he experienced persistent occurrences of rapid heart beating that did not rise

4

to the level of breakthrough attacks, but were accompanied by severe headaches.  These headaches occurred three to four times per week and disrupted plaintiff's sleep for three to four hours per night.

Prior to submitting his application for the position at issue in September 2004, plaintiff had one or two episodes per month of tachycardia, usually lasting less than five minutes. Plaintiff would have shortness of breath and feel weak and faint during an episode of tachycardia, but it did not prevent him from breathing.  Plaintiff does not use an inhaler or take any medications to help with his shortness of breath.  Plaintiff's tachycardia has not prevented or restricted his ability to see, hear, learn or care for himself.  The tachycardia causes weakness that makes it impossible for plaintiff to climb ladders, communication towers, glide slope towers and to lift heavy objects while working.  There has been no change in plaintiff's tachycardia symptoms since 1980.

Plaintiff also suffered a subarachnoid hemorrhage sometime in 1992 when he blacked out and an MRI found blood in a part of his brain.  Prior to his application in September 2004, plaintiff would have severe headaches seven or eight times a month caused by the subarachnoid hemorrhage.  Plaintiff sometimes went to work when he had severe headaches.  He never took anything stronger than aspirin to relieve his headaches.  He also experienced blurred vision, but not as often as the headaches.  Plaintiff experiences constant ringing in his ears because of the subarachnoid hemorrhage, which does not prevent him from hearing.  If plaintiff had a headache while taking a FAA class, he would go back over the objectives of the lesson to make sure he was able to retain the information.  The subarachnoid hemorrhage has not prevented or restricted plaintiff's breathing or ability to care for himself.  Prior to September 2005, plaintiff could walk

up to three to four miles a day with no problems.

Plaintiff was employed by the FAA from March 12, 2000 until December 17, 2004, when he resigned his position as an Airway Transportation Systems Specialist, FV-2101-III/Level H. Plaintiff's duty location was in Harlingen, Texas. As an Airway Transportation Systems Specialist, Level H, plaintiff's job duties included the maintenance, repair, certification, calibration, and modifications of and to the receiver transmitter communication systems at Harlingen, Texas. He worked on and assisted with the repair of rotary joints, and had to climb towers as part of his job duties.

On September 14, 2004, the FAA issued an Internal Vacancy Announcement for the position of Airway Transportation Systems Specialist, FV-2101-IV/Level I, with a duty location of Olathe, Kansas. The closing date for accepting applications for this Vacancy Announcement was September 29, 2004. On or about September 25, 2004, plaintiff submitted an application package for the position, which would be a promotion for him.

Deangela Hightower was the Human Resources specialist in the Human Resources Division in the Central Region (Kansas City) of the FAA, who was responsible for conducting the qualification analysis for the position announced. Hightower's job duties as a Human Resources specialist included putting out vacancy announcements. Once the vacancy announcements closed, she would receive the applications and review them for eligibility and qualifications. Hightower looked at the whole application package when she reviewed them for eligibility and qualifications. Hightower would do a comparison of the established qualification criteria to what the applicant presented to her in the application package. She would then produce a selection list and sometimes consult with the selecting official, then distribute the list

6

of qualified applicants to the selecting official.  Once the selection was made, Human Resources

had to make contact with the selectee or make a firm or tentative offer to the selectee.  Once an

offer was made, Human Resources performed the steps necessary to bring the selectee on board

or to promote the selectee.

The FAA received twenty-seven applications for the position announced, including

plaintiff's application.  Of the twenty-seven, Hightower rated seventeen applicants as qualified

and ten applicants, including plaintiff, as unqualified.  Of the seventeen applicants Hightower

rated as qualified for the position, four had identified themselves as handicapped by submitting a

Self-Identification of Handicap Form (SF-256) to the Human Resources Department.  Of the ten

applicants Hightower rated as unqualified for the position, four of the applicants, including

plaintiff, had identified themselves as handicapped as submitting SF-256 to Human Resources.

Although Hightower testified that part of her job duties was to input information into the

computer when an employee submitted a Self-Identification of Handicap Form to Human

Resources, she did not look at any of the applicants' self-identification of handicap information

during her qualifications analysis.

There were ten criteria that an applicant had to meet in order to be qualified for the

position of Airway Transportation Systems Specialist, Level I.  Hightower reviewed plaintiff's

application to determine whether he met all of the ten criteria for the position.  As required,

plaintiff included in his bid package an endorsement from his supervisor, Donald Saenz, which

evaluated plaintiff on the ten criteria for the position and rated him as either superior or

satisfactory on all ten criteria.  Plaintiff also included form #AF-SRG-006, entitled

"Standardized Ranking Factors For Airway Transportation Systems Specialist, GS-2101-

11/12/13."  In this form, plaintiff set forth his training, education and technical experience with

regard to a number of service systems, including the "ASR-9," which is an acronym for Airport

Surveillance Radar.  In his form, plaintiff stated that he had completed 360 hours of education on

the ASR-9 system theory of operations, and that he had two years of experience on the system

consisting of on the job training ("OJT") on November 20, 2002.

The Vacancy Announcement instructed the candidates to provide a separate written

narrative for each ability or qualification listed in the announcement.  Plaintiff provided the

following written narrative in regard to ability or qualification no. 9:

> Coordinated work with engineers, and vendors on installation of
> dual control configuration for DVRS2, BRITE, and ATIS.
> Identified problems that improved complex automated systems
> during installation of circuits.

Hightower testified that plaintiff's written narrative regarding ability or qualification no. 9 did

not provide enough information, and that he needed to elaborate more on any experience he may

have had regarding these systems.  She further testified that she was not familiar with the

acronyms that plaintiff listed and that she did not know what the systems were.  Hightower

testified that she did not know the difference between a complex and noncomplex system, and

that she did not know whether the systems listed by plaintiff qualified as complex systems.

After her review of plaintiff's application, Hightower thought he was unqualified for the

position based on his narrative responses to the questions and the application package as a

whole.  Hightower thought plaintiff's narratives on his demonstrated abilities did not contain

enough information for her to get a whole grasp of what his experience may have been.  She

testified that there are not any objective guidelines for determining what constitutes a sufficient

written narrative for each ability or qualification listed in an announcement and agreed that she makes a subjective analysis in deciding whether a written narrative is too short and needs to be espoused upon.  Hightower believed that plaintiff's application did not demonstrate the ability to deal with complex systems, one of the criteria for the position.  Hightower testified that she was looking for more experience than plaintiff included in his application.

Because Hightower did not have any personal knowledge of the technical aspects of the position, she asked a subject matter expert (SME), John Nimmo, to review plaintiff's application.  Hightower often referred applications to a SME when she deemed an applicant to be unqualified for a position in order to make sure she was making the right decision.  Nimmo reviewed those applications Hightower had questions about regarding demonstrated abilities because those applicants did not explain in detail what their jobs entailed.  Nimmo reviewed the applicants' demonstrated abilities and made comments on each of them as to whether he felt the applicant did or did not meet the demonstrated ability.

Nimmo reviewed plaintiff's application.  He testified that in plaintiff's discussion of demonstrated ability, plaintiff mentioned that he worked unsupervised; when looking at plaintiff's certifications, however, Nimmo observed that plaintiff was not certified in some of the areas where he indicated he worked unsupervised.  Nimmo testified that he questioned how plaintiff could work unsupervised on a piece of equipment and yet not be certified.  To be certified, an employee had to go through formal training, on-the-job training, and then pass a formal structured examination.  Nimmo found plaintiff to be unqualified for the position.  He met with Hightower about plaintiff's evaluation, where he went over his hand-written notes about plaintiff's application.

On October 15, 2004, plaintiff called Hightower to ask about the status of his application. Hightower informed plaintiff that she had determined he was not qualified for the position.  She explained to plaintiff that he was deemed not qualified because he failed to show the ability to work on complex systems in his application package and stated that he was not qualified because he did not have an ASR-9 certification, although that was not a requirement for the position. Plaintiff disagreed with Hightower's evaluation of his qualifications and brought up the fact that he was certified on the ASR-9 system.  Hightower told plaintiff that she would allow him to provide her with his ASR-9 certification and that she would review the information that he sent to her.  At no time during this conversation did plaintiff tell Hightower that he had a brain or heart impairment, or that he was impaired or disabled in any way.

On October 29, 2004, Hightower received a facsimile transmission enclosing plaintiff's certification record and the Performance Exam Cover Sheet for the ASR-9 equipment.  The cover sheet showed that plaintiff passed his exam on the ASR-9 equipment on October 8, 2004, and the certification record showed he was certified on the ASR-9 equipment on October 28, 2004.

Plaintiff called Hightower on November 12, 2004, asking about the status of his application.  Hightower testified that she told plaintiff during that conversation that if he could have shown he that he was certified prior to the closing of the bid, then they would have considered it.  Plaintiff testified that Hightower told him that she had the ASR-9 certification, but because he failed to submit the certification with his original bid package, she would not accept it since it would be unfair to others to have it added to his package.  At no time during this conversation did plaintiff tell Hightower that he had a heart or brain impairment or that he had a

10

disability.  Plaintiff did tell Hightower that he felt he was protected by the Disabled Veterans

Affirmative Action Program, and Hightower responded that the FAA was not required or bound

by this law or program.  It was Hightower's understanding that veterans' preference only applied

to people coming into the agency, not to internal applicants.

Hightower had not met plaintiff when she reviewed his application.  Plaintiff never told

Hightower he had a heart or brain impairment with regard to his application for the position, and

plaintiff does not believe that she knew that he had supraventricular tachycardia or a

subarachnoid hemorrhage.  Hightower knew that the Department of Veterans Affairs had

determined that plaintiff was entitled to compensation for service-connected disabilities rated at

30% or more.  Hightower testified that an applicant's disability played no factor in her rating an

applicant qualified or unqualified for the position of Airway Transportation Systems Specialist,

Level I.

Plaintiff had previously filed a petition for relief with the Merit Systems Protection Board

in December 2003, regarding a different Internal Vacancy Announcement.  Hightower was the

personnel specialist who evaluated plaintiff's application for that position, and recalled that the

substance of plaintiff's petition for relief was that he should have received a veterans' preference

for the position related to a 30% service-related disability.  The Merit System Protection Board

denied plaintiff's petition for relief and upheld the decision of the Department of Labor, which

had found that veterans' preference did not apply because plaintiff was rated not qualified, it did

not apply to in-service promotions, and because the additional preference for 30% disabled

veterans did not apply for professional or scientific positions at the GS-9 and above levels.

Hightower saw plaintiff's 30% disability letter from the Veterans Affairs in his bid package for

the 2003 position.  The letter did not state that plaintiff had a heart or brain impairment.

Although plaintiff's disability letter from Veterans Affairs was included in his application package, Nimmo testified that he had no knowledge as to whether plaintiff had a disability.  Hightower never discussed with or mentioned to Nimmo any of the applicants' disabilities or whether they had a disability.  Nimmo testified that whether an applicant had a disability played no role in his review of the applications and that his sole responsibility was to review the technical aspects of the applicant's demonstrated ability.  Nimmo has never met plaintiff.

When Hightower informed plaintiff on November 12, 2004, that he was not qualified for the position of Airway Transportation Systems Specialist, Level I, he believed she was discriminating him on the basis of his disability because she told him that the agency was not required to follow the Disabled Veterans Affirmative Action Program set out by the Department of Transportation.  On February 13, 2005, plaintiff filed a formal complaint of discrimination with the Department of Transportation.  In his complaint, plaintiff identified November 12, 2004 as the date of the most recent allegation of discrimination, which was the date plaintiff called Hightower and was informed that his request for consideration was denied.  Plaintiff identified "disability" as the reason he believed he was discriminated against, and stated his disability as "30% Disabled Vet."  Plaintiff cites to what he believed to be the FAA's failure to follow the Disabled Veterans Affirmative Action Program Plan.  In his complaint, plaintiff does not state or make any reference to the fact that his alleged disabilities were supraventricular tachycardia or subarachnoid hemorrhage.  There is nothing in plaintiff's complaint about what Hightower said to him about why she decided he was not qualified for the position, nothing concerning his belief

that Nimmo discriminated against him when he also determined plaintiff was not qualified for the position, nor anything regarding a request for reasonable accommodation.

Plaintiff's complaint was accepted for investigation by the Departmental Office of Civil Rights for the Department of Transportation on March 7, 2005.   The notification letter stated that the claim accepted for investigation was whether plaintiff was "discriminated against because of your disabilities when, on November 12, 2004, you learned that you would not be selected for the position of Airway Transportation Systems Specialist (OCC Specialist)."  There is no mention of a claim regarding any request for reasonable accommodation.

On March 2, 2005, Michael Thomas, the Equal Employment Opportunity Commission ("EEOC") investigator assigned to plaintiff's claim, held a telephone conference with plaintiff. Plaintiff identified two disabilities: 1) severe headaches caused by a "bubble" in his brain since birth, and 2) a heart impairment caused by electrocution while in the military.  In response to Thomas's question as to how plaintiff's disabilities limited him, plaintiff said that he was very rarely limited in what he could do.  Plaintiff told Thomas that his disabilities did not limit him in any way because at the time of the telephone conference, he felt he could do anything, and did not want to admit otherwise.  Other than climbing towers once a month, plaintiff was not limited in any way in everyday life activities.

Plaintiff believes that Hightower and Nimmo were aware of his medical conditions because he provided his DD-214 form, which is proof of military service, and the 30% disability letter from Veterans Affairs when he submitted his application package.  The 30% disability letter identified him as a disabled veteran, but did not show that he had disabilities of supraventricular tachycardia or subarachnoid hemorrhage.  Plaintiff believes that Hightower

discriminated against him because he is a disabled veteran with a 30% disability rating.

Plaintiff testified his request for reasonable accommodation consisted of having his qualifications for the position be reconsidered by another rating official other than Hightower. Plaintiff contends that Hightower failed to take affirmative action to employ him, including failing to consider his ASR-9 certification after the application deadline had passed. Plaintiff did not request that he be promoted to the position of Airway Transportation System Specialist, Level I as a reasonable accommodation of his disabilities because he could no longer perform the essential functions of his position as an Airway Systems Specialist, Level H.

## III. Discussion

### A. Disability Discrimination[17]

Plaintiff's first theory of recovery alleges that he was discriminated against by the defendant because of his disability when it was determined that he was not qualified for the position of Airway Transportation Systems Specialist, Level I. The familiar burden-shifting framework established in *McDonnell Douglas Corp. v. Green* applies in this case.[18] The plaintiff

---

[17]Plaintiff asserts a cause of action under both 29 U.S.C. §§ 791 and 794. In his response, plaintiff fails to address defendant's argument that he does not have a cause of action under § 794, which applies to federal grantees as opposed to federal employers. Although there is a split among the circuit courts on this issue, the Tenth Circuit is among those circuits holding that § 791 is the exclusive remedy for federal employees who allege disability discrimination. *See Vidacak v. Potter*, 81 F. App'x 721, 722 (10th Cir. 2003) (citing *Johnson v. United States Postal Serv.*, 861 F.2d 1475, 1477 (10th Cir. 1988)). Because plaintiff failed to address this issue in his response brief, he waives it. *See Hardeman v. City of Albuquerque*, 377 F.3d 1106, 1122 (10th Cir. 2004) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.") (quotation omitted); *Utahns for Better Transp. v. United States Dep't of Transp.*, 305 F.3d 1152, 1175 (10th Cir. 2002) ("[I]ssues will be deemed waived if they are not adequately briefed.").

[18]*Bennett v. Henderson*, 15 F. Supp. 2d 1097, 1105 (D. Kan. 1998), *aff'd*, 172 F.3d 62 (10th Cir. 1999) (Table) (citing *McDonnell Douglas*, 411 U.S. 792 (1973)).

bears the initial burden to establish a prima facie case of discrimination.[19]  Plaintiff must produce evidence that raises a reasonable inference that each element of a prima facie case exists.[20]  Once plaintiff establishes a prima facie case of discrimination, the burden shifts to defendant to articulate a legitimate, nondiscriminatory reason for its treatment of plaintiff.[21]

In order to survive summary judgment, plaintiff must establish a prima facie case of disability discrimination by demonstrating the following elements: (1) he is  "disabled" within the meaning of the Rehabilitation Act; (2) he is "otherwise qualified," that is, he can perform the essential functions of the job with or without accommodation; and (3) he was discriminated against because of his disability.[22]

### Disability

The Court first examines whether plaintiff is "disabled," within the meaning of the

---

[19]*Id*. (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993)).

[20]*Id*. (citing *Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 530 (10th Cir. 1994)).

[21]*Id*. (citing *Brinkman v. State Dep't of Corr.*, 863 F. Supp. 1479, 1485 (D. Kan. 1994)).

[22]*Woodman v. Runyon*, 132 F.3d 1330, 1338 (10th Cir. 1997) (noting that the same standard for a prima facie case applies in actions brought under the Americans With Disabilities Act (ADA)).  The standard applied under the ADA is also used to determine whether an act of discrimination violates the Rehabilitation Act.  *See* 29 U.S.C. § 791(g); 29 C.F.R. § 1614.203(b).  The Court therefore relies on cases applying the ADA in the course of this memorandum and order.  The Court also points out that recent amendments to the ADA substantially change how employers and courts are to evaluate ADA claims.  ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 (2008).  For example, Congress has expanded the class of major life activities to specifically include, among others, seeing and working. *Id*. at § 3(2)(A).  In addition, Congress expressly rejected certain holdings of the Supreme Court in *Sutton v. United Air Lines*, 527 U.S. 471, 489 (1999) and *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184 (2002), which "narrowed the broad scope of protection intended to be afforded by the ADA, thus eliminating protection for many individuals whom Congress intended to protect" and caused "lower courts [to] incorrectly [find] in individual cases that people with a range of substantially limiting impairments are not people with disabilitites." Pub. L. No. 110-325, § 2(a)(4), (5), & (6).  Because these amendments did not take effect until January 9, 2009, *id*. at § 8, and the parties do not argue that any of the amendments impact the issues in the case before it, the Court applies the laws and interpretations that were in force when the complained-of acts occurred. *See Landgraf v. USI Film Prods.*, 511 U.S. 244 (1994); *see also Kiesewetter v. Caterpillar, Inc.*, 295 F. App'x 850, 851 (7th Cir. 2008) (applying the presumption against retroactivity and finding the 2008 amendments to the ADA to be inapplicable to the case before it).

Rehabilitation Act.  Under 29 U.S.C. § 706(8)(B), a "disability" is defined to include the following: (i) a physical or mental impairment that substantially limits one or more of the major life activities of such an individual; (ii) a record of such an impairment; or (iii) being regarded as having such an impairment.  Plaintiff solely contends that he had a "record of" an impairment.[23] "A record of such impairment" is defined by the ADA regulations as "a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activites."[24]  The "record of" provision was intended "to address discrimination that occurs because of an individual's history of a disability or because of an individual's misclassification as disabled."[25]

The Tenth Circuit has established five elements a plaintiff must prove to establish a disability under the "record of" definition: (1) the plaintiff has a record of, or has been misclassified as having, (2) a recognized impairment that (3) the plaintiff "actually suffered" and that (4) substantially limited (5) a major life activity.[26]  A major life activity is a "basic activity

---

[23]Defendant argues that plaintiff has advanced a new theory of recovery by contending that he has a "record of an impairment."  Defendant contends that in the Pretrial Order plaintiff does not allege in his factual contentions or in his recitation of the essential elements of his prima facie case that he is proceeding under a theory that he has a record of an impairment.  The Pretrial Order states the essential elements of plaintiff's claim of discrimination as including "(1) He meets the definition of a 'qualified individual with a disability' within the meaning of the Rehabilitation Act." (Doc. 36 at 10).  While this language does not specifically identify a "record of impairment" definition, the Court will consider for purposes of this motion for summary judgment that plaintiff's complaint of discrimination based on disability as set forth in the Pretrial Order encompasses any and all of the potential definitions of that term. Moreover, while focusing on whether plaintiff had an actual disability, defendant addressed all three definitions in its memorandum in support of summary judgment (Doc. 39 at 30-42).

[24]29 C.F.R. § 1630.2(k).

[25]*Dotson v. ElectroWire Prods., Inc.*, 890 F. Supp. 982, 990 (D. Kan. 1995).

[26]*Zwygart v. Bd. of County Com'rs of Jefferson County, Kan.*, 483 F.3d 1086, 1091 (10th Cir. 2007) (citing *Doebele v. Sprint/United Mgt. Co.*, 342 F.3d 1117, 1129, 1132 (10th Cir. 2003)).

that the average person in the general population can perform with little or no difficulty."[27]

Major life activities include functions such as "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, sleeping, sitting, standing, lifting, reaching and working."[28] Whether a person is "substantially limit[ed]" must be determined by whether the individual is "[u]nable to perform a major life activity that the average person in the general population can perform," or is "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner or duration under which the average person in the general population can perform that same major life activity."[29] The court considers three factors in determining whether an impairment substantially limits a major life activity: (1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; and (3) the permanent or long term impact, or the expected permanent or long term impact, of or resulting from the impairment.[30]

Plaintiff contends that his 30% disability rating from the Department of Veterans Affairs showing a heart impairment of supraventricular tachycardia demonstrates a record of substantial limitation in the major life activity of sleep.[31] Defendant does not contest that plaintiff has a

---

[27]*Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 195 (2002) (quoting *Pack v. Kmart Corp.*, 166 F.3d 1300, 1305 (10th Cir. 1999)).

[28]*Rakity v. Dillon Cos.*, 302 F. 3d 1152, 1158 (10th Cir. 2002) (quoting *Doyal v. Okla. Heart, Inc.*, 213 F.3d 492, 495-96 (10th Cir. 2000)).

[29]*Doebele*, 342 F.3d at 1130 (quoting 29 C.F.R. § 1630.2(j)(i)).

[30]*Williams*, 534 U.S. at 196 (citing 29 C.F.R. § 1630.2(j)(2)(i)-(iii)).

[31]Plaintiff does not contend that he is a disabled individual under the Act based on his subarachnoid hemorrhage/brain impairment.

heart impairment or that sleep is a major life activity, but argues that he has failed to raise a

genuine issue of material fact about whether his impairment substantially limited his sleep.

The ADA regulation provides that

> The fact that an individual has a record of being a disabled veteran,
> or of disability retirement, or is classified as disabled for other
> purposes does not guarantee that the individual will satisfy the
> definition of 'disability' under part 1630 [of the ADA].  Other
> statutes, regulations and programs may have a definition of
> 'disability' that is not the same as the definition set forth in the
> ADA and contained in part 1630.[32]

Thus, plaintiff cannot simply rely on the fact that he received a 30% disability rating from the

Department of Veterans Affairs to establish a record of disability.  Rather, to satisfy this

definition, the "record" at issue must establish that at some point his heart impairment actually

did substantially limit his sleep.[33]  Neither the disability rating report nor Dr. Althouse's reading

of the January 1992 Holter monitor results, however, establish or even mention that plaintiff's

episodic tachycardia substantially limited his sleep or any other major life activity.  The

disability rating report merely states that plaintiff's tachycardia received a 30% disability rating

assigned for severe, frequent attacks.

Thus, the Court will assess plaintiff's claim by considering the nature and severity of the

impairment, its duration or expected duration, and the permanent or long term impact or

expected impact resulting from the impairment.[34]  Under these requirements, an individual must

---

[32] 29 C.F.R. app. 1630 (2006).

[33] *McKenzie v. Dovala*, 242 F.3d 967, 927 (10th Cir. 2001); *Dotson v. ElectroWire Prods., Inc.*, 890 F. Supp. 982, 990 (D. Kan. 1995).

[34] *Doebele*, 342 F.3d at 1132 (citation omitted).

18

make a significant showing of sleep impairment before he can show that a substantial limitation exists.[35]  Because "[d]ifficulty sleeping is extremely widespread[,]" a plaintiff must show "that his affliction is . . . worse than is suffered by a large portion of the nation's adult population."[36]

Plaintiff testified that for about two years prior to January 1992, before his tachycardia was documented and treated with medication, he experienced persistent occurrences of rapid heart beating, which were accompanied by severe headaches.  Plaintiff testified that these headaches occurred three to four times per week and that they disrupted his sleep for three to four hours per night.  The Tenth Circuit has stated that sleep deprivation that results in a plaintiff getting only two to three hours of sleep per night is not "severe" enough to constitute a substantial limitation on the major life activity of sleeping.[37]  Plaintiff does not explain how his tachycardia restricted the manner or duration of his sleep as compared to that of the average person.  Moreover, plaintiff testified that after his tachycardia was documented in 1992, he began taking medication to help control the condition and there is no evidence that he continued to have three to four hours of disrupted sleep three to four times per week after January 1992.  This absence of a permanent or long term impact of his impairment also weighs against a finding of substantial limitation.  Accordingly, plaintiff has not created a genuine issue of material fact that he has a "record of" an impairment under subsection (B) of the disability definition.

---

[35]*See, e.g., Pack v. Kmart Corp.*, 166 F.3d 1300, 1306 (10th Cir. 1999) (sleep deprivation that results in a plaintiff getting only two to three hours of sleep per night is not "severe" enough to constitute a substantial limitation on the major life activity of sleeping); *Swanson v. Univ. of Cincinnati*, 268 F.3d 307, 316 (6th Cir. 2001) ("While less than five hours of sleep is not optimal, it is not significantly restricted in comparison to the average person in the general population.").

[36]*Colwell v. Suffolk County Police*, 158 F.3d 635, 644 (2d Cir. 1998).

[37]*Pack v. Kmart Corp.*, 166 F.3d 1300, 1306 (10th Cir. 1999).

Summary judgment is granted on this claim.[38]

### B.       Failure to Take Affirmative Action

The Rehabilitation Act encompasses two means of discrimination—disparate treatment as alleged in plaintiff's first claim, and failure to accommodate.[39]  Plaintiff's second theory of recovery is that defendant failed to take affirmative action to provide employment opportunities to him, in violation of 29 U.S.C. § 791(b).[40]  Specifically, plaintiff contends that Hightower failed to consider his ASR-9 certification after the bidding period for the vacancy had expired and alternatively, that his request that someone other than Hightower consider his application was denied.  Defendant argues that plaintiff's claim is actually a claim of failure to accommodate and that plaintiff failed to exhaust his administrative remedies with respect to his claim.  Although defendant agrees with plaintiff that a federal employer has a greater responsibility with regard to the employment of disabled individuals under § 791(b), it argues that this heightened duty is the duty to provide reasonable accommodations to its employees with disabilities so that they can perform their duties in spite of their disabilities.[41]

 Section 501 of the Rehabilitation Act requires federal agencies to develop affirmative action programs for the hiring, placement, and advancement of individuals with disabilities.[42]  "It

---

[38]Because the Court finds that plaintiff has not established that he has a record of an impairment that substantially limits a major life activity, it does not reach issue of whether defendant must have knowledge of the impairment.

[39]*Peebles v. Potter*, 354 F.3d 761, 765-66 (8th Cir. 2004).

[40]As previously noted, the Court dismissed Count III of plaintiff's Complaint alleging defendant failed to promulgate and implement an affirmative action program, on the grounds that his allegation alleged a violation of the Rehabilitation Act as well as VEVRA, and thus no private remedy existed for his claim (Doc. 37 at 7-8).

[41]*See Woodman v. Runyon*, 132 F.3d 1330, 1337-38 (10th Cir. 1997); *Peebles*, 354 F.3d at 767.

[42]*See* 29 U.S.C. § 791(b).

is well established both by the statutory language and Supreme Court decisions interpreting the Act that federal employers have greater duties to accommodate disabled workers under section 501 than the duties owed by federal grantees under section 504 or those owed by employers under the ADA."[43]  To establish a prima facie case for failure to accommodate under the Rehabilitation Act, a plaintiff must show that (1) he is an individual with a disability within the meaning of the Act; (2) he is otherwise qualified for the position, meaning he could perform the essential functions of the job with reasonable accommodation; (3) defendant was aware of plaintiff's disability; (4) plaintiff needed an accommodation, meaning a causal relationship existed between the disability and the request for accommodation; and (5) defendant failed to provide the necessary accommodation.[44] Reasonable accommodation claims are evaluated under a "'modified burden-shifting analysis'" rather than *McDonnell Douglas*.[45]  The employee must first establish a prima facie case, then the burden shifts to the employer to demonstrate that reasonable accommodation would impose an undue hardship on its operations.[46]

Although plaintiff has not cited, nor could the Court find, any cases that recognized a separate claim for failure to take affirmative action, plaintiff sets forth the elements of his claim in the Pretrial Order as (1) he meets the definition of a qualified individual with a disability within the meaning of the Act; (2) Hightower failed to take affirmative action to employ plaintiff; and (3) Hightower's failure to take affirmative action caused plaintiff not to be

---

[43]*Woodman*, 132 F.3d at 1334.

[44]*Massari v. Potter*, No. 04-CV-02306EW, 2006 WL 318658, at *14 (D. Colo. Feb. 9, 2006) (citing *DiCarlo v. Potter*, 358 F.3d 408, 419-20 (6th Cir. 2004)).

[45]*Peebles*, 354 F.3d at 766.

[46]*Id.*

qualified for the position for which he applied.[47]

The Court finds that plaintiff's claim must fail as a matter of law under either the failure to accommodate claim or the affirmative action theory as articulated by defendant.  Simply put, because the Court has ruled that plaintiff does not have a record of an impairment that substantially limited the major life activity of sleep, he does not meet the definition of an individual with a disability within the meaning of the Act.  Because plaintiff has not established this key element of his prima facie case, the Court need not address whether defendant failed to accommodate his disability, failed to take affirmative action to employ him in violation of § 791(b) or whether the two duties cannot be equated.[48]

Moreover, regardless of whether there is an independent claim for failure to take affirmative action, plaintiff failed to exhaust his administrative remedies with regard to his claim.  Plaintiff's formal complaint of discrimination makes no mention of defendant's failure to provide him with a reasonable accommodation or to take affirmative action to employ him.  Nor does the claim that was accepted for investigation by the EEOC include an allegation by plaintiff that defendant failed to provide a reasonable accommodation or take affirmative action.  Exhaustion of administrative remedies is a prerequisite to bringing a lawsuit in federal court.[49]  Summary judgment is also granted on this claim.

---

[47](Doc. 36 at 10.)

[48]*See Corley v. Dept. of Veterans Affairs*, 218 F. App'x 727, 738 (10th Cir. 2007) (citing *Woodman*, 132 F.3d at 1337-38 n. 6) (a federal employer does not have a heightened duty to provide reasonable accommodation to a federal employee who does not meet the definition of a disabled individual under the Rehabilitation Act).

[49]*Greenlee v. United States Postal Serv.*, 247 F. App'x 953, 955 (10th Cir. 2007).  Because plaintiff does not respond to or challenge this issue in his response or surreply, the issue is deemed waived.  *See Utahns for Better Transp. v. United States Dept. of Transp.*, 305 F.3d 1152, 1175 (10th Cir. 2002).

**IT IS THEREFORE ORDERED BY THE COURT** that defendant's Motion for

Summary Judgment (Doc. 38) is GRANTED.

IT IS SO ORDERED.

Dated:  May 15, 2009

 S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE